UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-80795-CIV-HURLEY/HOPKINS

FLAGSTAR BANK, FSB,

 Plaintiff,

vs.

A.M. HOCHSTADT, et al.,

 Defendants.
_____/

**MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS
OF LAW ON PLAINTIFF'S MOTION FOR DEFICIENCY JUDGMENT**

**THIS CASE** involves a dispute about the fair market value of property in a mortgage foreclosure action. The plaintiff bank contends that a figure slightly above that realized at an advertised foreclosure sale represents fair market value. The defendant homeowner disagrees, arguing that a comparison with more recently built homes offers the most accurate estimate of fair market value. For the reasons discussed below, the court rejects both extremes in determining fair market value. Accordingly, pursuant to Rule 52(a), the court sets forth its findings of fact and conclusions of law.

## I. Findings of Fact

*A. Background*

A.M. Hochstadt ("Mr. Hochstadt") owned residential real estate at 289 Key Palm Road in Boca Raton, Florida. In 2006, he applied for loans from Flagstar Bank, FSB ("Flagstar") to refinance an existing note and mortgage on the property and to obtain a home equity line of credit. To facilitate the transaction, Flagstar obtained an appraisal which valued the property at $7.2 million. Applying a 60/40 ratio, Flagstar loaned Mr. Hochstadt $4.3 million, and issued a $500,000 home equity line of credit.

Mr. Hochstadt executed two notes in favor of Flagstar, and both notes were secured by mortgages on the property.[1]

Mr. Hochstadt failed to make the installment payment due on the notes on March 1, 2008 and failed to make all subsequent payments. As a result, Flagstar filed this action, alleging that Mr. Hochstadt breached both notes and seeking foreclosure of both mortgages. The court granted summary judgment in Flagstar's favor, finding that Mr. Hochstadt had breached the notes. The court then entered final judgment holding Mr. Hochstadt liable for the amounts due under the notes, $5,631,531.45, and directing the United States Marshal to place the property for sale by public auction pursuant to 28 U.S.C. § 2001 *et seq.* unless the judgment was satisfied forthwith. Subsequently, the court granted-in-part Flagstar's motion for fees and costs, and entered final judgment holding Mr. Hochstadt liable for an additional $227,495.93. Thus, Mr. Hochstadt's total indebtedness to Flagstar is $5,859,027.38.

Mr. Hochstadt failed to satisfy the judgments, and so a foreclosure sale took place on September 30, 2009. Flagstar purchased the property for a nominal sum, and the court confirmed the sale. Thereafter, Flagstar filed the instant motion for deficiency judgment, asserting that the fair market value of the property on the date of foreclosure sale was less than the amount of indebtedness.

*B. The Property*

The Hochstadt property is located in the Royal Palm Yacht and Country Club (the "subdivision"), one of Boca Raton's most exclusive subdivisions. It contains a mix of one- and two-story homes, many of which appear to be extremely luxurious. Some abut deep-water canals with

---

[1] Terez Hochstadt, Mr. Hochstadt's wife, signed also signed the mortgages, but not the notes. Although Mrs. Hochstadt is a defendant in this action, Flagstar seeks a deficiency judgment against only Mr. Hochstadt.

2

access to the Intracoastal Waterway and Atlantic Ocean, while others are situated on a golf course. The waterfront properties are considered more valuable.

Mr. Hochstadt purchased his waterfront property in 1988 for $700,000. The lot measured 22,927 square feet with 82 feet of water frontage. It contained a one-story home without a pool. In 1990, he demolished the home and replaced it with a two-story structure, at a cost of approximately $2 million. The newly constructed home had nearly 9,000 square feet of living space. It contained eight bedrooms, nine bathrooms, a 400-bottle wine cellar, a floating staircase, a library with built-in bookshelves, a spacious kitchen with sub-zero appliances, and a fireplace. Outside was a private gate, a two-car garage, an open pool and spa, and a large dock that could accommodate a 53-foot boat. As renovated, the Hochstadt home was one of the most attractive in the community.

In the early 2000's, the subdivision entered what Mr. Hochstadt described as an "era of teardowns." Purchasers often demolished existing structures and replaced them with outsized mansions. This trend caused the Hochstadt home to be relegated to the status of "average."

In 2002, Mr. Hochstadt decided to make major renovations to his home. He testified that he "replaced the entire driveway," "widened the garage from a two-car garage to a three-car garage," added "a golf cart area behind the garage," and installed "new tile in the floor." He built an "apartment above the garage [with] a staircase leading up to the apartment, made a private entrance for [the apartment] and put a bathroom [in it] and then put a roof over it." He added "balconies on both sides of the apartment and put a separate air conditioning system in it." He also replaced the air conditioning system in the home, expanded the mother-in-law suite, spruced up the front bedroom, installed new marble in other bathrooms and bedrooms, and added a second utility room. He replaced the dock, installed new outside lighting, and replaced the heat pump for the spa. These improvement took

3

approximately three years to complete and cost over $700,000.[2]

### C. Characterization of the Property

The parties dispute the impact of the renovations. Flagstar contends that they had no impact on the overall value of the home. Consequently, Flagstar describes it as an outdated home built in 1990 and argues that it must be compared to other homes built in that time frame. Mr. Hochstadt, on the other hand, contends that the renovations place his home on a par with others built in the 2000's. Indeed, he suggests it should be compared with homes built as recently as one year ago.

The court finds neither characterization accurate. First, as a finding of fact, the court holds that the Hochstadt home, as renovated, is not the equivalent of a home built in the early 2000's. Rather, it must be viewed as a home built in 1990, with later, significant renovations. Some of the renovations, however, were merely cosmetic, and there is no credible evidence that the core of the house (*i.e.*, the roof, electrical system, plumbing, and the like) was upgraded after 1990. Some of the structural additions to the house, such as the apartment above the garage, are made out of wood-frame, and credible evidence suggests that prospective buyers would view such additions negatively as "add-ons," as opposed to a unified component of the house. Furthermore, the home lacks multiple features , *e.g.*, hurricane impact windows, that would be considered standard in a newly built home.

By the same token, it would not be accurate to label the Hochstadt residence as simply a "1990 home." Mr. Hochstadt spent $700,000 renovating his property in an effort to match the newer and larger homes in the neighborhood. As a result, the renovated home contains many features that homes of the 1990's would not have, such as an automated home management system, which allows one to

---

[2] The court notes that Mr. Hochstadt introduced only limited visual evidence of the renovations. Notably, he failed to introduce documentary evidence, such as architectural plans, building permits, construction contracts, or interior design plans.

control the appliances, air conditioner, and sprinkler from a touchscreen pad or by computer. Thus, the court finds that the subject property is superior to properties built in the early 1990's, but is not the equivalent of a newly constructed home. Rather, it must be viewed as one built in 1990 but modernized significantly in the 2000's. Furthermore, the effective age of the property (as well as its value) must be viewed in light of the ongoing teardown phenomenon. To some potential buyers, the Hochstadt home would be regarded as a tear-down with value only as land. To others, the value of the home would be diminished by its proximity to newer, more exquisite mansions in the subdivision.

### D. Plaintiff's Witnesses

#### i. Steven Beaulieu

Flagstar hired Steven Beaulieu, a licensed real estate broker, to sell the subject property. Mr. Beaulieu testified that the property was not a high-end, luxury home, but an outdated home in disrepair. He noted multiple problems: roof leaks, visible mold, and neglected landscaping. He listed the property for $2.4 million and claims to have shown it to at least 150 prospective buyers during a two-week listing period. He testified that knowledge of the bank's foreclosure did not negatively affect the resale value of the property. Flagstar sold the property for $2.2 million.

The court rejects most of Mr. Beaulieu's testimony as not credible nor worthy of belief. Many of the home's "problems" were cosmetic in nature and did not depress the value of the home to the extent claimed by Mr. Beaulieu. Furthermore, the court firmly rejects Mr. Beaulieu's opinion that the advertised bank foreclosure sale did not have a negative impact on the price received at the sale.

#### ii. Patrick Sullivan

Patrick Sullivan, a state certified real estate appraiser, served as Flagstar's expert witness and prepared an appraisal for use in this litigation. Though Mr. Sullivan performed an exterior-only appraisal, he spoke to real estate agents who were familiar with the property and reviewed numerous

5

photographs of its interior. Mr. Sullivan has appraised over 10,000 homes, but the subject property is the only one he has appraised in the subdivision. For the purpose of the appraisal, he assumed that the interior was in very good condition.

Based on photos, Mr. Sullivan opined that the interior of the home had the characteristics of one built in 1990. He stated that the subject property was "nice and clean," but "plain and simple." He also testified that age is an "extremely important" consideration for buyers of high-end real estate. Therefore, for comparables, he selected five properties that had been built between 1990 and 2000.

His comparables ranged in age from 13 to 18 years. They have gross living area ranging from 4,650 to 7,120 square feet, and range in value from $2.2 million to $3 million. All of his comparables are waterfront properties with close to 80-feet of water frontage. Two of the comparables are one-story homes, and three are two-story homes. From these comparables and after making various adjustments, Mr. Sullivan valued the Hochstadt property at $2.8 million.

Based on the testimony and evidence presented, the court rejects three of the Sullivan comparables as so inferior to the subject property that they provide no comparative value whatsoever. This includes two comparables that are one-story homes with roughly half the living space of the subject property and with much smaller lots (indeed, one of the lots is less than half the size of the subject property's); and a third comparable that not only has eight thousand fewer square feet of land, but also is, according to Mr. Sullivan's report, considered a teardown, with value only as land.

The court finds that the two remaining Sullivan comparables to be unlike the subject property in key respects, but nonetheless are of some comparative use. One such dissimilarity is size: both comparables have approximately 6,500 fewer square feet of land and 2,000 fewer square feet of living area than the Hochstadt home. Another is age: although the comparables were built more recently (*i.e.*, 13 and 14 years ago), there is no credible evidence to suggest that they were significantly renovated

6

in the 2000's, as was the subject property[3]

In adjusting for the differences between the subject property and the comparables, the court finds that Mr. Sullivan made at least two errors. First, he miscalculated the Hochstadt property's square footage. He stated the home has 8,288 square feet of living space, when, in fact, it has 8,831 square feet. The court accepts and relies upon the testimony of Michael Cibene, Mr. Hochstadt's expert, who personally measured the house twice and found it contains 8,831 square feet.[4] Using Mr. Sullivan's estimate that each square footage of living space is worth $150, the difference in square footage adds $81,450 to the value of Mr. Sullivan's appraisal.

Additionally, Mr. Sullivan assigned a value of roughly $8 per square foot in making adjustments for the difference in land size between the properties. This figure is inadequate. The court finds that 6,500 square feet of land is worth more than $52,000. In this regard, the court finds that the figure used by Mr. Hochstadt's expert, $60 per square foot, is more accurate. Using a value of $60 per square foot increases Mr. Sullivan's appraisal by roughly $340,000.

After excluding the three properties identified above, and making the above-mentioned

---

[3] Given the difference in size, the comparables selected by Mr. Sullivan represent a different class of home. According to the testimony of Mr. Hochstadt and Mr. Cibene, which the court credits as credible and worthy of belief, homes within the community fall in one of three categories: homes around 3,000 square feet, which are generally considered teardowns; mansions around 4,000 to 7,000 square feet; and even larger mansions that are 7,000 square feet or larger. When moving between classes, home values increase not just arithmetically, but geometrically based upon size. Here, the comparables selected by Mr. Sullivan appear to fall in the middle class, while the subject property appears to fall in the latter.

[4] While Mr. Hochstadt understandably has been "optimistic" about his property and its value, Mr. Cibene demonstrated professionalism and needed independence in not succumbing to the home owner's enthusiasm. During the 2006 appraisal, Mr. Hochstadt complained that Cibene had undervalued his home and underestimated its square footage. After revisiting the home, remeasuring the property, and talking to Mr. Hochstadt, Mr. Cibene stood his ground, concluding that the calculation was accurate. He also held firm on his estimate that the home was worth $7.2 million.

adjustments, Mr. Sullivan's appraisal suggests that the subject property is worth more than $3.25 million. Even so, and for the reasons to follow, the court finds this estimation not to be an accurate estimate of the property's fair market value.

*E. Defense Witnesses*

*i. Mr. Hochstadt*

Mr. Hochstadt's testimony about the condition and effective age of his property differed greatly from Mr. Beaulieu's. Mr. Hochstadt testified that he left the house in good condition. He further opined that, as renovated, it was the functional equivalent of a home built in the 2000's. While his understanding of the features of his property was evident, so too was his bias due to his deep personal affection for the home in which he had lived for nearly 20 years.

Relying on admissible public records, Mr. Hochstadt noted that the value of waterfront properties in the subdivision had dropped by an average of 12% to 15.5% from 2006 to 2010. Crediting Mr. Cibene's $7.2 million appraisal from 2006, Mr. Hochstadt's opined that the subject property has a fair market value between $6.34 or $6.08 million.[5] To buttress his position, Mr. Hochstadt noted that Mr. Sullivan's apprisal of $2.8 million amounts to a 61% diminution in value relative to Mr. Cibene's 2006 apprisal of $7.2 million.

Mr. Hochstadt's testimony is not well taken to the extent that it attempts to show precise

---

[5] An owner of property is qualified to testify as an expert regarding the value of his property. *See Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1526 (11th Cir. 1988); *United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 636-37 (10th Cir.1988) (when a purported owner of property is testifying as to the value of the property, his testimony qualifies as expert witness testimony under Fed. R. Evid. 702 and he "is entitled to the privileges of a testifying expert"). "The weight of such testimony is, of course, affected by the owner's knowledge of circumstances which affect value, and as an interested witness, it is for the jury to evaluate the credibility of his testimony." *Berkshire Mutual Ins. Co. v. Moffett*, 378 F.2d 1007, 1011 (5th Cir. 1967) (footnotes omitted).

8

fluctuations in the fair market value of properties in the subdivision. He admitted that the Property Appraiser's valuations do not reflect fair market value, but instead an artificially lower amount; and the fluctuations in artificial values do not necessarily mirror the fluctuations in fair market values. His testimony is credible, however, to the extent it shows, generally, that waterfront properties in the subdivision depreciated at rates nowhere near the 61% reduction for which Flagstar argues. Indeed, Flagstar has not identified a single property in the community whose value dropped by anywhere near 61% from 2006 to 2010.

*ii. Michael Cibene*

Michael Cibene, a state certified property appraiser, prepared an appraisal of the Hochstadt home and testified as Mr. Hochstadt's expert on valuation. As indicated, this was not Mr. Cibene's first exposure to the property. Flagstar hired him in 2006 to value the property. That appraisal resulted in a valuation of $7.2 million, and it is undisputed that Flagstar relied upon the apprisal in issuing Mr. Hochstadt the two loans that are the focus of this action.

Mr. Cibene appraises approximately 500 properties per year, many of which are in the multimillion-dollar range. He has appraised eleven other properties in the subdivision and has substantial knowledge about its history and characteristics. Although he was unable to inspect the interior of the Hochstadt home in preparing the second appraisal, he was familiar with its interior and amenities because he of his prior work.

Mr. Cibene testified that the quality, finish, style, and condition of the Hochstadt home suggested it had been built more recently than 1990. He noted the luxurious features of the home, which caused him to consider it a "high-end" property. He classified it as "a large, luxury home of the 2000's."

To value the property, Mr. Cibene compared it to three other properties that he felt were similar

in size and age to the Hochstadt home. He emphasized that size and age are the most important factors in appraising property. Thus, all of his comparable properties were built in the 2000's, are located within two blocks of the Hochstadt home, and are on the water. After comparing the subject property to the three comparables and making adjustments for square footage and features, and after making depreciation deductions, Mr. Cibene's second appraisal valued the Hochstadt property at $5.9 million, or 18% less than his 2006 appraisal.

Two of the Cibene comparables, 181 West Coconut Palm Road and 510 East Alexander Palm Road, were built in 2009 and have approximately 8,000 fewer square feet of land and 1,000 fewer square feet of living area than the Hochstadt home. Mr. Cibene valued each of those properties at approximately $7 million. Based on the testimony and evidence presented, the court rejects Mr. Cibene's premise that these properties provide useful information. They represent new construction and are much smaller than the Hochstadt home, thus requiring significant, and admittedly imprecise, adjustments to allow for comparison of the properties. Consequently, the court finds they provide little, if any, comparative value.

Mr. Cibene testified that the third property, 289 West Coconut Palm Road, is the most comparable of the three properties he selected. The home, a 9,987-square-foot, two-story mansion, was built in 2002 and sits on a 24,394-square-foot waterfront lot. The court agrees with Mr. Cibene's opinion that the home at 289 West Coconut Palm Road is sufficiently similar to the Hochstadt home to provide a useful basis for comparison. However, the court does not accept Mr. Cibene's conclusions in their entirety. Foremost, the court rejects the assertion that a home constructed in 2002 can serve as a comparable for valuing the Hochstadt home without making an additional, signficant reductions. Making formulaic adjustments will not satisfy the gap between a newly constructed structure and the Hochstadt renovated home.

10

A visual comparison of the Hochstadt property with the home at 289 West Coconut Palm Road reveals that the Hochstadt home, which is unquestionably comfortable and attractive (indeed, many would consider it luxurious), is not on the same level as the home at 289 West Coconut Palm Road. The latter property is markedly upscale with such features as a large, marble staircase, recessed ceilings, a large kitchen with custom cabinetry, and a modern, elegantly shaped pool – features that convey a degree of opulence that the Hochstadt residence lacks.

Furthermore, Mr. Cibene failed to account for the difference in water frontage between the two properties. The Hochstadt home has roughly 25% less water frontage than 289 West Coconut Palm Road.

Mr. Cibene's appraisal relied upon a $6.5 million sales price for 289 West Coconut Palm Road based upon MLS sales records. While an expert may rely on hearsay if it is of the type normally utilized by experts in the field – and certainly information in a MLS listing falls into this category for expert appraisers – the weight to be ascribed to the expert's opinion may be lessened if a hearsay premise is shown to be inaccurate. In this case, admissible records from the Palm Beach County Property Appraiser's office indicate that the property actually sold for $5.5 million. Faced with this conflict, the court elects to credit the public records, finding that the property actually sold for $5.5 million.

### F. Fair Market Value on Date of Foreclosure Sale

The value of the Hochstadt home is affected not only by its size, age, and location, but also by the teardown phenomenon, the recent bursting of the housing bubble, and the preferences of buyers in the market for high-end real estate. Further, the subject property is located in a subdivision where properties differ from one another in many way (including architectural style, size, design, and lot type), making it difficult to find properties that have meaningful comparative value.

As discussed above, the court rejects two of Mr. Cibene's comparables and three of Mr. Sullivan's, because they are so different than the subject property that they provide little, if any, comparative value. The court finds that one Cibene comparable, 289 West Coconut Palm Road, is most similar to the Hochstadt home and provides the most useful basis of comparison, but nonetheless requires a significant reduction. Making this reduction, the court determines, as a finding of fact, that the fair market value of 289 Key Palm Road on the date of foreclosure sale was $4.5 million.

## II. Conclusions of Law

"The granting of a deficiency decree in a mortgage foreclosure action is a matter for the sound judicial discretion of the trial court." *S/D Enters., Inc. v. Chase Manhattan Bank*, 374 So.2d 1121, 1122 (Fla. 3d DCA 1979). A mortgagee "seeking a deficiency judgment after completion of a mortgage foreclosure sale in Florida must present competent evidence that the indebtedness owed exceeds the fair market value of the property on the date of foreclosure." *First Union Nat'l Bank v. Goodwin Beach P'ship*, 644 So.2d 1361, 1362 (Fla. 5th DCA 1994). In Florida, "the granting of a deficiency judgment is the rule rather than the exception" *S/D Enters.*, 374 So.2d at 1122.

"Appraising real estate is more an art than a science; it is incapable of mathematical precision and implicates methods of judgment." *United States v. 1,378.65 Acres of Land Situate in Vernon County*, 794 F.2d 1313, 1318-19 (8th Cir.1986). Here, the court has found that the fair market value of the Hochstadt home on the date of foreclosure sale was $4.5 million. The total debt ($5,859,027.38) minus the fair market value of the property ($4.5 million) results in a deficiency of $1,359,027.38.

## III. Conclusion

Based on the foregoing, it is **ORDERED** and **ADJUDGED** that:

1. Flagstar's motion for deficiency judgment [DE # 268] is **GRANTED-IN-PART**. The court finds that the amount of the deficiency is $1,359,027.38

Memorandum Opinion
Flastar Bank, FSB v. Hochstadt, et al.
Case No. 08-80795-CIV-HURLEY-HOPKINS

    2.    Pursuant to Rule 58, the court will issue final judgment by separate order.

**DONE** and **SIGNED** in Chambers at West Palm Beach, Florida this 30th day of December, 2010.

                                          Daniel T. K. Hurley
                                          United States District Judge

*Copies provided to counsel of record*